UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tamara Lee Bolognani,

        Plaintiff,

        v.                                Civil Action No. 1:14-cv-156-jgm-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

        Defendant.

## REPORT AND RECOMMENDATION
(Docs. 15, 18)

Plaintiff Tamara Bolognani brings this action pursuant to 42 U.S.C. § 405(g) of the

Social Security Act, requesting review and remand of the decision of the Commissioner of

Social Security denying her applications for Disability Insurance Benefits (DIB) and

Supplemental Security Income (SSI).  Pending before the Court are Bolognani's motion to

reverse the Commissioner's decision (Doc. 15), and the Commissioner's motion to affirm the

same (Doc. 18).  For the reasons stated below, I recommend that Bolognani's motion be

GRANTED, the Commissioner's motion be DENIED, and the matter be REMANDED for

further proceedings and a new decision.

## Background

Bolognani was 29 years old on her alleged disability onset date of December 15, 2009.

She struggled with school both academically and socially, finding it difficult to concentrate and

being bullied by her classmates.  (AR 47, 389, 422.)  She dropped out in the 11th grade but

later returned and graduated from high school at age 21.  (*Id.*)  In 2006, Bolognani graduated from Greenfield Community College where she received an associate's degree in science and fine arts.  (AR 47, 309, 389.)  She then attended Southern Vermont College, majoring in creative writing with a focus on children's literature.  (*Id.*; AR 422, 711.)  While in college, she wrote and illustrated a children's book and also worked part time.  (AR 393.)  In the fall of 2009, however, Bolognani left college while in her senior year, failing to graduate.  (AR 54, 711.)

Bolognani has had a variety of jobs, including as an assistant manager and manager at a movie theater, a cook, a housecleaner, a waitress/bartender, a cashier, a model for an art class, and a seasonal worker on a farm.  (AR 47–48, 58, 711.)  She has also worked on several unpaid projects for family members including designing artwork for tickets at a charity event and designing a logo for a business.  (AR 49–50.)  In March 2013, Bolognani was working 10 hours per week as a mentor for people with developmental disorders.  (AR 48–49, 52–53.)  She has financial problems, including being unable to pay her student loans and credit card debt, and has considered filing bankruptcy.  (AR 420–21, 650–51.)

Bolognani has a history of depression going back to her teenage years, and reports a family history of depression on her mother's side.  (AR 387–90, 604.)  She describes herself as being depressed and tired most of the time and having trouble falling asleep, difficulty concentrating, and anxiety in stressful situations.  (AR 50, 387.)  In December 2009, Bolognani's treating psychiatrist diagnosed her with major depressive disorder, anxiety disorder, and sleep disorder, as well as psychosocial and financial problems.  (AR 393.)  In September 2010, Bolognani was admitted to the Brattleboro Retreat for 16 days due to

worsening symptoms of depression and suicidal ideation.  (AR 420–23, 428; *see also* AR 563 ("hospitalized for severe depression with suicidal ideation complicated by unemployment, financial stress[,] and [a] difficult living situation").  A little over one year later, in November 2011, Bolognani's treating therapist stated that Bolognani had extreme difficulty making medical appointments and was unable to follow through with recommended treatments "because of her limitations in her living situation, lack of transportation[,] and lack of energy." (AR 564.)

In July 2011, Bolognani filed applications for SSI and DIB, alleging that, starting on December 15, 2009, she has been unable to work due to the following conditions: depression; anxiety; bipolar disorder; insomnia; acid reflux; dislocated knee caps; and weak and painful joints, knees, and ankles.  (AR 244, 251, 308.)  In a July 2010 Function Report, Bolognani stated that she was working 16 to 18 hours per week, but that "[i]t takes all my effort to get up in the morning and work," and "I regularly feel . . . on the verge of tears [at work]."  (AR 286.) She further stated that she became "very stressed and full of anxiety" when she was at work. (*Id.*)  About three months later, Bolognani explained in an updated Function Report that she was still working part time (about 15 hours per week), but was "very stressed and anxious" at work, "constantly tired," and suffering from insomnia.  (AR 316.)  At the March 2013 administrative hearing, Bolognani testified that, on a typical day, she has coffee, takes Adderall, cares for her pets (a rabbit and a cat), naps on some days, sits a lot, and does household chores but only for 10-minute periods.  (AR 51–52, 64.)  In addition, as noted above, Bolognani testified that she works for 10 hours a week as a mentor for people with developmental disorders.  (AR 52–53.)  She further testified that she does not leave the house

much, other than to go to work, and does not go food shopping because she has anxiety around people.  (AR 65–66.)

Bolognani's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on March 4, 2013 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 43–78.)  Bolognani appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified.  On April 24, 2013, the ALJ issued a decision finding that Bolognani was not disabled under the Social Security Act from her alleged disability onset date of December 15, 2009 through the date of the decision.  (AR 25–36.)  Thereafter, the Appeals Council denied Bolognani's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–4.)  Having exhausted her administrative remedies, Bolognani filed the Complaint in this action on July 28, 2014.  (Doc. 4.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment

4

meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Bolognani had not engaged in substantial gainful activity since her alleged disability onset date of December 15, 2009. (AR 27.) At step two, the ALJ found that Bolognani had the severe impairments of affective (depressive) disorder, anxiety disorder, and personality disorder. (AR 27–28.) Conversely, the ALJ found that the following conditions were nonsevere: arthralgias, headaches, attention deficit disorder, hypermobility syndrome, acid reflux, insomnia, and bipolar disorder. (AR 28.) At step three, the ALJ found that none of Bolognani's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 29–30.)

Next, the ALJ determined that Bolognani had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: "She can sustain concentration, persistence[,] and pace for two-hour blocks of time over an [eight]-hour workday and workweek.  [She] can perform [three]-plus step low[-]stress activities, can manage changes expected in a routine work setting, avoid hazards, and travel."  (AR 30.) Given this RFC, the ALJ found that Bolognani was unable to perform her past relevant work as a companion, an artist model, a short order cook, a housekeeper, a waitress, a greenhouse worker, a motion picture projectionist, a cashier, and a book binder.  (AR 34–35.)  Based on testimony from the VE, however, the ALJ determined that Bolognani could perform other jobs existing in significant numbers in the national economy, including the representative occupations of cashier and ticket seller.  (AR 35–36.)  The ALJ concluded that Bolognani had not been under a disability from her alleged disability onset date of December 15, 2009 through the date of the decision.  (AR 36.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

In considering a Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.").  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305.  In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

<u>**Analysis**</u>

Bolognani asserts that the ALJ erred in his analysis of the medical opinions and in his assessment of her credibility.  Specifically, Bolognani claims the ALJ should have given more weight to the treating physicians' opinions and less to the agency consultant's opinions. Moreover, Bolognani claims the ALJ's negative assessment of her credibility was not supported by substantial evidence.  In response, the Commissioner contends that substantial evidence supports the ALJ's RFC determination and credibility assessment.

For the following reasons, I find in favor of Bolognani and recommend remanding for further proceedings and a new decision.

## I.    Analysis of Medical Opinions

In November 2011, agency consultant Dr. Roy Shapiro opined, based on his review of the record, that Bolognani had a severe affective disorder and a severe personality disorder. (AR 121.)  Dr. Shapiro further opined that these impairments caused moderate restriction in Bolognani's activities of daily living; mild difficulties in her ability to maintain social functioning; moderate difficulties in her ability to maintain concentration, persistence, or pace; and one or two episodes of decompensation lasting an extended duration.  (AR 122.) Dr. Shapiro stated that, due to her mental impairments, Bolognani was moderately limited in her ability to complete a normal workday and workweek without interruptions and to perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 124.) Dr. Shapiro limited Bolognani to being able to maintain concentration, persistence, or pace for two-hour periods throughout the workday, and doing three-plus-step, low-stress, unskilled work in a routine work setting.  (*Id.*; AR 127.)

Although Dr. Shapiro never saw, evaluated, or treated Bolognani, the ALJ gave his opinions "substantial" and "great" weight (AR 33), and essentially adopted Dr. Shapiro's findings in the RFC determination, finding that Bolognani can "sustain concentration, persistence[,] and pace for two-hour blocks of time[;] . . . can perform 3-plus[-]step[,] low[-]stress activities[; and] can manage changes expected in a routine work setting" (AR 30).  The ALJ based his decision to give great weight to Dr. Shapiro's opinions on the grounds that they are consistent with the record, including: (1) "the totality of the medical evidence";

8

(2) Bolognani's "ability to sustain semi-skilled and very social part[-]time work during the period"; and (3) "the consistently normal objective findings." (AR 33.) Although it is true that Bolognani was able to sustain semi-skilled, part-time work that required socializing during the relevant period, and this was indeed a proper factor for the ALJ to consider in assessing Bolognani's claim;[1] substantial evidence does not support the ALJ's findings that the "totality of the medical evidence" is consistent with Dr. Shapiro's opinions or that the medical evidence contains "consistently normal objective findings." (*Id.*) Rather, as discussed below, the record contains numerous treatment notes from Bolognani's treating and examining mental health providers documenting her struggle to function because of her depression and sleeping problems. And several of Bolognani's treating and examining mental health providers opined that Bolognani's impairments are severely limiting.

Specifically, Dr. Catherine Hickey, Bolognani's treating psychiatrist since July 2008, diagnosed Bolognani with major depressive disorder and sleep disorder in January 2010, and stated that Bolognani was "very depressed prior to [Christmas] and found it very difficult to complete her college courses." (AR 391.) Dr. Hickey noted that Bolognani's affect was flat and she appeared fatigued; the Doctor assigned a Global Assessment of Functioning (GAF) score of 50 to Bolognani (*id.*), which indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)," *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, at 32 (4th ed. 2000).

---

[1] *See* 20 C.F.R. § 404.1571 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."); *Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) ("[T]he fact that [the claimant] could perform some work cuts against his claim that he was totally disabled.").

Nine months later, in September 2010, Bolognani was admitted to the Brattleboro Retreat due to a "long history of depression" with worsening symptoms over the prior eight months and daily suicidal ideation.  (AR 420.)  Dr. Andrea Vidal, Bolognani's treating psychiatrist at the Retreat, stated that Bolognani was having difficulty falling asleep and getting out of bed in the morning, "at times not sleeping for close to 48 hours and then sleeping excessively" for 14–16 hours at a time.  (*Id.*)  Dr. Vidal recorded that Bolognani had not returned to work and reported having a decrease in interests and energy, feelings of guilt and self-reproach because she was unable to finish school, and occasional anxiety attacks. (AR 421.)  On examination, Dr. Vidal noted that Bolognani "had been crying to the point [that] her eyes were swollen and re[]d. . . .  Eye contact varied. . . .  Psychomotor activity was mildly decreased. . . .  Mood was depressed, tearful.  Affect was constricted and quite dysphoric. . . . Patient endorsed feelings of guilt, hopelessness[,] and helplessness."  (AR 422–23.)  Dr. Vidal diagnosed Bolognani with depression and possibly bipolar disorder, and assessed her with a GAF score of 32 (AR 423), which indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)," *DSM-IV*, at 32.  Bolognani was hospitalized for 16 days before she was discharged in an "[i]mproved" condition with a "[f]air" prognosis and final diagnoses of bipolar disorder, depressive episode, rule out attention deficit disorder, dependent personality disorder, and chronic fatigue symptoms.  (AR 432.)

Starting after this hospital admission in September 2010 and continuing until at least January 2013, Bolognani saw Dario Lussardi, MA, for individual psychotherapy on a weekly or biweekly basis.  (*See* AR 466–68, 551–62, 565–604, 606–07, 650–64, 671, 729–58.)  On August 4, 2011, Lussardi diagnosed Bolognani with major depressive disorder and bipolar disorder (AR 468), and described Bolognani as having been "plagued by chronic depression since an[] early age" (AR 467).  On the same date, Lussardi recorded in a status report that Bolognani was suicidal and appeared lethargic with very low mood and affect, poor attention/concentration, poor short term memory, low energy level, and highly disturbed sleep.  (AR 466.)  Lussardi explained that Bolognani had been unable to obtain "meaningful employment" or return to complete her education due to her feelings of hopelessness, an insufficient social support system, social anxiety, and sleep disturbance.  (AR 468.)  The ALJ gave "limited weight" to Lussardi's opinions, largely because he was "not an accepted medical source."  (AR 34.)  Although this was a proper factor to consider in assessing Lussardi's opinions, *see* 20 C.F.R. § 404.1513(a), the ALJ should have given more weight to these opinions considering that Lussardi had an extensive treating relationship with Bolognani and specialized in the treatment of depression and other mental health problems; and Lussardi's opinions are consistent with and supported by the medical record and other treating and examining provider opinions, *see id.* at (d)(1); 20 C.F.R. § 404.1527(c); SSR 06-03p, 2006 WL 2329939, at *4–5 (2006).

Following Bolognani's discharge from the Brattleboro Retreat in September 2010, her primary care physician, Dr. Barbara Masley, began prescribing psychotropic medications for her.  (*See, e.g.*, AR 460–61.)  In June 2011, Dr. Masley stopped prescribing lithium, stating

that Bolognani "could not tolerate" it, but continued her other prescriptions including alprazolam for anxiety. (AR 437.) Dr. Masley stated that Bolognani was "working closely with [a] therapist" and opined that "it is appropriate for her to try to get disability as I do not think she can work full time." (*Id.*) In November 2011, Dr. Masley indicated that she would refer Bolognani to psychiatrist Dr. Mario Hasaj, noting that Bolognani's depression was "difficult to treat." (AR 536.) A few months later, in January 2012, Dr. Masley noted that Bolognani's depression was "[u]nchanged" and "poorly responsive to med[ication]s." (AR 548.) About a year later, in February 2013, Dr. Masley responded to interrogatories about Bolognani's functioning and opined that Bolognani's mood disorder with depression and anxiety affected her ability to function, and resulted in marked difficulties in maintaining concentration, persistence, or pace. (AR 762, 767.) Dr. Masley further opined that Bolognani had "debilitating fatigue and achiness which may tie into her mood disorder." (AR 767.)

Despite Dr. Masley's status as Bolognani's treating physician, the ALJ afforded "little weight" to her opinions. (AR 33.) The ALJ explained that Dr. Masley's opinions are inconsistent with Bolognani's ability to do part-time managerial work, inconsistent with objective findings indicating that Bolognani's mental status was "normal" for most of the relevant period, and inconsistent with medical records indicating that Bolognani experienced only one period of decompensation which "came after a long period during which [Bolognani] sought no mental health treatment." (*Id.*) Substantial evidence does not support the ALJ's reasoning, particularly regarding objectively "normal" findings in the record. Generally, the record demonstrates that Bolognani's treating or examining mental health providers did not believe she was functioning at a normal level during the relevant period. Although there are

some medical records indicating that Bolognani was "'alert, oriented, and cooperative [with]
normal mood and affect, normal attention span and concentration'" at medical appointments
(*id.* (citing AR 435–63, 508, 527–49, 629–38, 690–93)), there are many more medical records,
discussed herein, indicating that Bolognani was severely depressed during the relevant period
(*see, e.g.*, AR 391 (flat affect, appears fatigued), 422–23 (mood depressed; tearful; affect
constricted and dysphoric; feelings of guilt, hopelessness, and helplessness; increasing suicidal
ideation), 466 (reported mood and observed affect very low, poor attention/concentration,
highly disturbed sleep, low energy), 564 (due to social anxiety and sleep disturbance,
extremely difficult to make and keep medical appointments), 712 (anxious and depressed
mood, affect constricted, thought process tangential and overly detailed, judgment and insight
poor), 781 (suffering depression since childhood, no interest or energy, low self-esteem,
trouble falling asleep and getting up, having suicidal thoughts)).

Furthermore, the ALJ's finding that Bolognani's only period of decompensation was her
2010 hospitalization (*see* AR 29, 33) is not supported by the record.  The record reflects that
Bolognani decompensated in December 2009 (as well as in December 2010), when her
employer, Janet Boyd, called United Counseling Services (UCS) due to concerns about
Bolognani's mental health.  (AR 58, 392.)  The treatment note from UCS indicates that
Dr. Hickey and Physician's Assistant Sue Conner "offered Tamara to be screened by [their]
crisis team and to consider hospitalization for stabilization," but Bolognani declined.
(AR 392.)  In a Job Screening Questionnaire, Boyd explained that Bolognani had worked for
her for two years, on and off, but Bolognani had to leave the job because she "could not
function."  (AR 278.)  Boyd explained that Bolognani did not wear clean clothes "much of the

time" (*id.*), had "big problems" getting up in the morning, appeared to work late most of the time due to oversleeping, worked very slowly at everything "as if physically and mentally she [wa]s just drained," appeared "very tired or sad much of the time," had a problem "sorting out basic everyday things," and was "very limited in every way" (AR 279).

In September 2012, Dr. Hasaj performed a psychiatric evaluation of Bolognani at Dr. Masley's request. (AR 775.) Dr. Hasaj wrote that Bolognani reported: "Feeling helpless all the time, no interest in things. No energy. I am crying all the time. Low self-esteem. Trouble falling asleep. Trouble getting up. Hard to get out of bed. Suicidal thoughts." (AR 776.) Based on his consultation with Bolognani, Dr. Hasaj diagnosed Bolognani with major depressive disorder and attention deficit hyperactivity disorder and assessed her with a GAF score of 40–45. (AR 778.) A score of 31–40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *DSM-IV*, at 32. And a score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning." *Id.* The ALJ afforded "limited weight" to Dr. Hasaj's opinions "based upon the record as a whole showing normal functional mental capabilities: 'alert, oriented, and cooperative, normal mood and affect, normal attention span and concentration.'" (AR 34 (citing AR 435–63, 508, 527–49, 629–38, 690–93).) As discussed above, substantial evidence does not support this finding.

On January 15, 2013, approximately four months after Dr. Hasaj evaluated Bolognani, psychiatrist Dr. Linda Jasperse saw Bolognani in consultation. (AR 710.) Dr. Jasperse

observed that Bolognani's mood was anxious and depressed, her affect was constricted, her thought process was tangential and overly detailed, and her judgment and insight were poor. (AR 712.)  Dr. Jasperse diagnosed major depressive disorder, anxiety disorder, and dependent personality disorder, and assessed Bolognani with a GAF score of 45 (*id.*), indicating "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)," *DSM-IV*, at 32.  Dr. Jasperse saw Bolognani again about a month later and noted that she "has a difficult time focusing her attention, thinks about defects in herself, has very low energy, and feels her thinking is slowed."  (AR 795.)  After assessing Bolognani's mood with the "quick inventory of depressive symptomatology self-report, on which she scored . . . in the moderate range for depression," Dr. Jasperse found that Bolognani's symptoms were "about the same" as her prior visit (*id.*), and again noted that Bolognani exhibited poor judgment and insight (AR 796).  At this visit, Dr. Jasperse assessed Bolognani with a GAF score of 50 instead of 45 (*id.*), which–though higher than the earlier score–still indicates serious symptoms or impairments, *see DSM-IV*, at 32.  Like Dr. Hasaj's opinions, the ALJ afforded "[l]imited weight" to Dr. Jasperse's opinions on the grounds that they are not consistent with the rest of the record.  (AR 34.)  The ALJ explained: "[Dr. Jasperse's] opinions are based on [Bolognani's] self-report and responses to self-report instrument and not consistent with the record as a whole."  (*Id.* (citing AR 435–63, 508, 527–49, 550–609, 629–38, 650–71, 690–93, 729–43, 744–58).)

The observations and opinions of these six treating or consulting providers–treating psychiatrists Dr. Hickey and Dr. Vidal, treating therapist Lussardi, treating primary care

15

physician Dr. Masley, and consulting psychiatrists Dr. Hasaj and Dr. Jasperse, five of them specialists in mental health–are all generally aligned in their belief that Bolognani is seriously limited by her mental impairments.  Particularly noteworthy, the reports of Drs. Hickey, Vidal, Hasaj, and Jasperse, all include low GAF scores of between 32 and 50, indicating their respective opinions that Bolognani's symptoms were serious at various times during the relevant period, as discussed above.[2]  Dr. Shapiro's contrary opinions, on the other hand, stand alone.  This may be because Dr. Shapiro made his opinions about Bolognani's mental limitations in November 2011, well before several relevant medical opinions were added to the record.  Specifically, when Dr. Shapiro made his November 2011 opinions, he did not have the benefit of Dr. Hasaj's September 2012 psychiatric evaluation, Dr. Jasperse's January 2013 psychiatric evaluation and February 2013 treatment note, and Dr. Masley's January 2013 responses to interrogatories.  The ALJ failed to recognize this critical fact, despite the Second Circuit's well-established holding that, where it is unclear whether an agency consultant reviewed all of the claimant's relevant medical information, the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician. *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011).  Although Drs. Hasaj and Jasperse did not have an extensive treating relationship with Bolognani, each seeing her on only one or two

---

[2]  This Court has consistently held that, although a claimant's GAF score is not dispositive of her ability to work, it is "one factor" for the ALJ to consider in determining whether the claimant is disabled. *See, e.g.*, *Chandler v. Soc. Sec. Admin.*, No. 5:12-cv-155, 2013 WL 2482612, at *9 (D. Vt. June 10, 2013); *Parker v. Comm'r of Soc. Sec. Admin.*, Civil Action No. 2:10-CV-195, 2011 WL 1838981, at *6 (D. Vt. May 13, 2011). Not only was Bolognani assigned several low GAF scores during the alleged disability period, as discussed above, she was also assigned the low GAF scores of 45 and 46 by medical providers at United Counseling Service in 2008, before the alleged disability period began. (*See* AR 388 (GAF score of 45 assigned by psychiatrist Dr. Benjamin Marte in April 2008), 390 (GAF score of 46 assigned by Dr. Hickey in February 2008).)

occasions, respectively, their opinions are valuable given that they are acceptable medical sources who examined Bolognani, as compared with Dr. Shapiro who did not.

I find that the ALJ erred in giving great weight to Dr. Shapiro's opinions on the grounds that these opinions are consistent with the medical evidence. Moreover, I find that the ALJ erred by not accounting for Dr. Shapiro's failure to consider the unequivocal 2012 and 2013 medical opinions of Bolognani's treating primary care physician (Dr. Masley) and two examining psychiatrists (Dr. Hasaj and Dr. Jasperse). As discussed above, all three of these physicians, as well as treating therapist Lussardi and treating psychiatrists Dr. Hickey and Dr. Vidal, indicated in evaluation reports and treatment notes that Bolagnani's mental impairments seriously affected her ability to function and work. Generally, where there are conflicting opinions between treating and consulting sources, the "consulting physician's opinions . . . should be given limited weight." *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990). This is particularly true where, as here, the consulting source did not examine the claimant and made his opinions without considering all the relevant medical information. *See Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted); *Tarsia*, 418 F. App'x at 18 (medical consultant's assessment deemed incomplete where it was unclear whether he reviewed all of the evidence, including in particular "the evaluation, radiographic, and diagnostic notes of . . . an orthopedist who diagnosed [claimant] with severe degenerative arthritis of the left knee and found her to be a candidate for total knee arthoplasty") (internal quotation marks omitted).

17

The opinions of treating physicians, on the other hand, are generally entitled to more weight.  In fact, under the treating physician rule, a treating physician's opinions must be given "controlling weight" when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Even when a treating physician's opinions are not given controlling weight, the regulations require the ALJ to consider several factors— including the length of the treatment relationship, the frequency of examination, whether the opinions are supported by relevant evidence and consistent with the record as a whole, and whether the physician is a specialist in the medical area addressed in the opinions—in determining how much weight they should receive.  *Id.* at § 404.1527(c); *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008).  In addition, the regulations provide that the ALJ "will always give good reasons in [his] . . . decision for the weight [he] give[s] [to the claimant's] treating source's opinion."  20 C.F.R. § 404.1527(c)(2); *see Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998).  "The failure to provide '"good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand.'"  *Greek v. Colvin*, Docket No. 14–3799, 2015 WL 5515261, at *3 (2d Cir. Sept. 21, 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008)).

As discussed above, I find that the ALJ did not give good reasons for affording little weight to the opinions of treating physician Dr. Masley and limited weight to the opinions of examining consultant Dr. Hasaj and examining/treating consultant Dr. Jasperse.  Nor did the ALJ give good reasons for affording limited weight to the opinions of treating therapist Lussardi.  The ALJ failed to recognize that all of these opinions are relatively aligned with

each other as well as with the opinions and treatment notes of Dr. Hickey and Dr. Vidal.  The ALJ also failed to give credit to the opinions of Bolognani's psychiatric providers/consultants based on their specialization in mental health.  Finally, the ALJ failed to give credit to the opinions of Dr. Masley and Lussardi based on their extensive treatment relationship with Bolognani.

The Commissioner argues that the ALJ's failure to acknowledge that Dr. Shapiro's opinions did not take into account the opinions of Drs. Hasaj and Jasperse, was harmless because "[t]he record unambiguously reflects that Ms. Bolognani's worst symptoms occurred in 2010, when she received in-patient care following a year-long stretch of not receiving therapy and medication."  (Doc. 18 at 12 (citing AR 421–22).)  The Commissioner reasons that, if Dr. Shapiro determined that Bolognani could work during the pre-hospitalization 2009–2011 period, there are no grounds to believe his opinion would have been different concerning the subsequent period when her condition was "consistently stable."  (*Id.*)  This argument fails, given the opinions of multiple treating and consulting physicians and therapists that Bolognani's mental impairments seriously affected her ability to function after 2010 and throughout the alleged disability period.  Moreover, the treatment record demonstrates that, after her release from the Brattleboro Retreat in 2010, Bolognani required ongoing therapy and medication.  Moreover, as Bolognani argues in her reply: "The determination of disability is not limited to looking at the period when a claimant's symptoms are at their worst, but rather, the determination is made by looking at the whole period of time disability is claimed." (Doc. 19 at 6.)

The Commissioner also argues that the ALJ properly gave less value to the treating and consulting provider opinions because they are inconsistent with Bolognani's ability to work part time "in a highly social workplace for years, rising to assistant manager and supervising a staff of four on her own." (Doc. 18 at 13.) Bolognani's work activity was significant at times during the relevant period, and considerably more than the typical disability claimant is able to do. But this activity does not diminish the ALJ's legal errors: the ALJ was still required to follow the treating physician rule and give good reasons for affording little weight to the treating and consulting provider opinions while affording great weight to the opinions of the nonexamining agency consultant. Furthermore, the Second Circuit has held that eligibility for disability benefits is not contingent on a claimant being rendered completely incapacitated and thus unable to do any work at all. *See Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988) ("[T]he Social Security Act is a remedial statute, to be broadly construed and liberally applied[;] . . . [thus,] a claimant need not be an invalid to be found disabled under . . . the Social Security Act.") (citation and internal quotation marks omitted); *see also Dugan v. Sullivan*, 957 F.2d 1384, 1391 (7th Cir. 1992) ("'[P]ost-disability employment is not necessarily disqualifying in every case. The question is not simply answered by the fact of [the claimant's] employment or the extent of her earnings. Rather, the answer turns on whether she was disabled within the meaning of the Act notwithstanding the fact that she actually did work.'" (quoting *Stark v. Weinberger*, 497 F.2d 1092, 1100 (7th Cir. 1974))).

## II.    Assessment of Bolognani's Credibility

Next, Bolognani claims the ALJ erred in finding that Bolognani's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not entirely

credible." (AR 32.) The ALJ based this credibility assessment on the finding that "the objective medical evidence of record does not fully support [Bolognani's] allegations" and Bolognani "has failed to establish a correlation between her allegations and the objective medical evidence." (*Id.*) As discussed above, these findings are not supported by substantial evidence, and in fact, the record contains objective medical evidence from multiple treating and examining sources showing that Bolognani suffers from serious depression. Even the nonexamining agency consultant, Dr. Shapiro, stated that his opinion that Bolognani could do only simple, unskilled, low-stress work was based on objective medical evidence. (AR 123–24.) On remand, after conducting a new analysis of the medical opinions, the ALJ should reassess Bolgonani's credibility.

## Conclusion

The Commissioner is correct that there is evidence in the record which supports the ALJ's decision that Bolognani is not disabled, including Bolognani's ability to work part time in a managerial position at a stressful job during the relevant period, her statements to medical providers about not wanting to work and hoping to receive disability so she could pursue other interests such as sewing, and her large financial debt and other life situations that appear to have contributed to her depression and limited ability to function. (*See* Doc. 18 at 17.) However, as discussed above, the ALJ erred in his analysis of the medical opinions, most importantly in failing to consider that Dr. Shapiro had not reviewed the opinions of the treating and examining psychiatrists and therapists prior to making his opinions. Remand is necessary to afford Dr. Shapiro (or another agency consultant) an opportunity to review the full record– including Dr. Hasaj's September 2012 psychiatric evaluation, Dr. Jasperse's January 2013

psychiatric evaluation and February 2013 treatment note, and Dr. Masley's January 2013 responses to interrogatories–prior to preparing a new report.

For these reasons, I recommend that Bolognani's motion (Doc. 15) be GRANTED; the Commissioner's motion (Doc. 18) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 4th day of November, 2015.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).